(Slip Opinion)                OCTOBER TERM, 2005                1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MARSHALL *v.* MARSHALL

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 04–1544.  Argued February 28, 2006—Decided May 1, 2006

Among longstanding limitations on federal-court jurisdiction otherwise properly exercised are the so-called "domestic relations" and "probate" exceptions.  Neither is compelled by the text of the Constitution or federal statute.  Both are judicially created doctrines stemming in large measure from misty understandings of English legal history. In view of lower federal-court decisions expansively interpreting the two exceptions, this Court reined in the domestic relations exception in *Ankenbrandt* v. *Richards*, 504 U. S. 689, and endeavored similarly to curtail the probate exception in *Markham* v. *Allen*, 326 U. S. 490.

 Petitioner, Vickie Lynn Marshall (Vickie), a.k.a. Anna Nicole Smith, is the surviving widow of J. Howard Marshall II (J. Howard), who died without providing for Vickie in his will.  According to Vickie, J. Howard intended to provide for her through a gift in the form of a "catch-all" trust.  Respondent, E. Pierce Marshall (Pierce), J. Howard's son, was the ultimate beneficiary of J. Howard's estate plan.  While the estate was subject to ongoing Texas Probate Court proceedings, Vickie filed for bankruptcy in California.  Pierce filed a proof of claim in the federal bankruptcy court, alleging that Vickie had defamed him when, shortly after J. Howard's death, her lawyers told the press that Pierce had engaged in forgery, fraud, and over-reaching to gain control of his father's assets.  Pierce sought a declaration that his claim was not dischargeable in bankruptcy.  Vickie answered, asserting truth as a defense.  She also filed counterclaims, among them a claim that Pierce had tortiously interfered with a gift she expected from J. Howard.  Vickie's tortious interference counterclaim turned her objection to Pierce's claim into an adversary proceeding, see Fed. Rule Bkrtcy. Proc. 3007, in which the Bankruptcy Court granted summary judgment for Vickie on Pierce's claim and,

after a trial on the merits, entered judgment for Vickie on her counterclaim. The court also held that both Vickie's objection to Pierce's claim and her counterclaim qualified as "core proceedings" under 28 U. S. C. §157, which meant that the court had authority to enter a final judgment disposing of those claims. It awarded Vickie substantial compensatory and punitive damages. Pierce then filed a posttrial motion to dismiss for lack of subject-matter jurisdiction, asserting that Vickie's tortious interference claim could be tried only in the Texas probate proceedings. The Bankruptcy Court denied the motion. Relying on *Markham,* the Bankruptcy Court observed that a federal court has jurisdiction to adjudicate rights in probate property, so long as its final judgment does not interfere with the state court's possession of the property. Subsequently, the Texas Probate Court declared that J. Howard's estate plan was valid.

Back in the federal forum, Pierce sought district-court review of the Bankruptcy Court's judgment. Among other things, the District Court held that the probate exception did not reach Vickie's counterclaim. Citing *Markham*, 326 U. S., at 494, the court said that the exception would bar federal jurisdiction only if such jurisdiction would "interfere" with the probate proceedings. It would not do so, the court concluded, because: (1) success on Vickie's counterclaim did not necessitate any declaration that J. Howard's will was invalid, and (2) under Texas law, probate courts do not have exclusive jurisdiction to entertain claims of the kind Vickie's counterclaim asserted. The court also held that Vickie's claim did not qualify as a "core proceedin[g]" over which a bankruptcy court may exercise plenary power, see 28 U. S. C. §157(b)–(c). Accordingly, the District Court treated the Bankruptcy Court's judgment as proposed, rather than final, and undertook *de novo* review. Adopting and supplementing the Bankruptcy Court's findings, the District Court determined that Pierce had tortiously interfered with Vickie's expectancy by, *inter alia*, conspiring to suppress or destroy the *inter vivos* trust instrument J. Howard had directed his lawyers to prepare for Vickie, and to strip J. Howard of his assets by backdating, altering, and otherwise falsifying documents and presenting them to J. Howard under false pretenses. The District Court awarded Vickie some $44.3 million in compensatory damages and, based on "overwhelming" evidence of Pierce's willfulness, maliciousness, and fraud, an equal amount in punitive damages.

The Ninth Circuit reversed. Although the Court of Appeals recognized that Vickie's claim does not involve the administration of an estate, the probate of a will, or any other purely probate matter, it nonetheless held that the probate exception bars federal jurisdiction in this case. It read the exception broadly to exclude from the federal

courts' adjudicatory authority not only direct challenges to a will or trust, but also questions which would ordinarily be decided by a probate court in determining the validity of the decedent's estate planning instrument, whether those questions involve fraud, undue influence, or tortious interference with the testator's intent. The court also held that a State's vesting of exclusive jurisdiction over probate matters in a special court strips federal courts of jurisdiction to entertain any probate related matter, including claims respecting tax liability, debt, gift, and tort. Noting that the Probate Court had ruled it had exclusive jurisdiction over all of Vickie's claims, the Ninth Circuit held that ruling binding on the Federal District Court.

*Held:* The Ninth Circuit had no warrant from Congress, or from this Court's decisions, for its sweeping extension of the probate exception recognized in those decisions. Because this case does not fall within the exception's scope, the District Court properly asserted jurisdiction over Vickie's counterclaim against Pierce. Pp. 8–18.

   (a) *Ankenbrandt* addressed the domestic relations exception's derivation and limits. Among other things, the Court, 504 U. S., at 693–695, traced the current exception to *Barber* v. *Barber*, 21 How. 582, 584–589, in which the Court had announced in dicta—without citation or discussion—that federal courts lack jurisdiction over suits for divorce or alimony. Finding no Article III impediment to federal-court jurisdiction in domestic relations cases, 504 U. S., at 695–697, the *Ankenbrandt* Court, *id.*, at 698–701, anchored the exception in the Judiciary Act of 1789, which, until 1948, provided circuit court diversity jurisdiction over "all suits of a civil nature at common law or in equity." The *Barber* majority, the *Ankenbrandt* Court acknowledged, 504 U. S., at 698, did not expressly tie its announcement of a domestic relations exception to the text of the diversity statute, but the *Barber* dissenters made the connection. Because English chancery courts lacked authority to issue divorce and alimony decrees, the dissenters stated, United States courts similarly lacked authority to decree divorces or award alimony, 21 How., at 605. The *Ankenbrandt* Court was "content" "to rest [its] conclusion that a domestic relations exception exists as a matter of statutory construction not on the accuracy of [*Barber*'s] historical justifications, but, "rather," on "Congress' apparent acceptance of this construction of the diversity jurisdiction provisions in the years prior to 1948," 504 U. S., at 700. *Ankenbrandt* further determined that Congress did not intend to terminate the exception in 1948 when it "replace[d] the law/equity distinction with the phrase 'all civil actions.'" *Id.,* at 700. The *Ankenbrandt* Court nevertheless emphasized that the exception covers only "a narrow range of domestic relations issues." *Id.*, at 701. Noting that some lower federal courts had applied the exception "well beyond the cir-

cumscribed situations posed by *Barber* and its progeny," *ibid.*, the Court clarified that only "divorce, alimony, and child custody decrees" remain outside federal jurisdictional bounds, *id.*, at 703, 704. While recognizing state tribunals' "special proficiency" in handling issues arising in the granting of such decrees, *id.*, at 704, the Court viewed federal courts as equally equipped to deal with complaints alleging torts, *ibid.* Pp. 8–11.

(b) This Court has recognized a probate exception, kin to the domestic relations exception, to otherwise proper federal jurisdiction. See, *e.g., Markham,* the Court's most recent and pathmarking pronouncement on the subject. Among other things, the *Markham* Court first stated that, although "a federal court has no jurisdiction to probate a will or administer an estate[,] it has [long] been established . . . that federal courts of equity have jurisdiction to entertain suits 'in favor of creditors, legatees and heirs' and other claimants against a decedent's estate 'to establish their claims' so long as the federal court does not interfere with the probate proceedings or assume general jurisdiction of the probate or control of the property in the custody of the state court." 326 U. S., at 494. The Court next described a probate exception of distinctly limited scope: "[W]hile a federal court may not exercise its jurisdiction to disturb or affect the possession of property in the custody of a state court, . . . it may exercise its jurisdiction to adjudicate rights in such property where the final judgment does not undertake to interfere with the state court's possession save to the extent that the state court is bound by the judgment to recognize the right adjudicated by the federal court." *Ibid.* The first of these quoted passages is not a model of clear statement, and some lower federal courts have read the words "interfere with the probate proceedings" to block federal jurisdiction over a range of matters well beyond probate of a will or administration of a decedent's estate, including an executor's breach of fiduciary duty. This Court reads *Markham*'s enigmatic words, in sync with the second above-quoted passage, to proscribe "disturb[ing] or affect[ing] the possession of property in the custody of a state court." *Ibid.* Though that reading renders the first-quoted passage in part redundant, redundancy in this context is preferable to incoherence. This Court therefore comprehends *Markham*'s "interference" language as essentially a reiteration of the general principle that, when one court is exercising *in rem* jurisdiction over a *res*, a second court will not assume *in rem* jurisdiction over the same *res*. See, *e.g.*, *Penn General Casualty Co.* v. *Pennsylvania ex rel. Schnader*, 294 U. S. 189, 195–196. Thus, the probate exception reserves to state probate courts the probate or annulment of a will and the administration of a decedent's estate; it also precludes federal courts from disposing of property that is in the custody

of a state probate court.  But it does not bar federal courts from adjudicating matters outside those confines and otherwise within federal jurisdiction.  Pp. 11–15.

(c) Vickie's claim does not involve the administration of an estate, the probate of a will, or any other purely probate matter.  Provoked by Pierce's claim in the bankruptcy proceedings, Vickie's claim alleges the widely recognized tort of interference with a gift or inheritance.  She seeks an *in personam* judgment against Pierce, not the probate or annulment of a will.  Cf. *Sutton* v. *English,* 246 U. S. 199, 208.  Nor does she seek to reach a *res* in a state court's custody.  See *Markham*, 326 U. S., at 494.  Furthermore, no "sound policy considerations" militate in favor of extending the probate exception to cover this case.  Cf. *Ankenbrandt*, 504 U. S., at 703.  Trial courts, both federal and state, often address conduct of the kind Vickie alleges.  State probate courts possess no "special proficiency" in handling such issues.  Cf. *id.*, at 704.  P. 15.

(d) This Court rejects the Ninth Circuit's alternate rationale that the Texas Probate Court's jurisdictional ruling bound the Federal District Court.  Texas courts have recognized a state-law tort action for interference with an expected gift or inheritance.  It is clear, under *Erie R. Co.* v. *Tompkins*, 304 U. S. 64, that Texas law governs the substantive elements of Vickie's tortious interference claim.  But it is also clear that Texas may not reserve to its probate courts the exclusive right to adjudicate a transitory tort.  See *Tennessee Coal, Iron & R. Co.* v. *George*, 233 U. S. 354, 360.  Jurisdiction is determined "by the law of the court's creation and cannot be defeated by the extraterritorial operation of a [state] statute . . . , even though it created the right of action." *Ibid.*  Directly on point, the Court has held that federal-court jurisdiction, "having existed from the beginning of the Federal government, [can] not be impaired by subsequent state legislation creating courts of probate." *McClellan* v. *Carland*, 217 U. S. 268, 281.  *Durfee* v. *Duke*, 375 U. S. 106, on which the Ninth Circuit relied, is not to the contrary.  *Durfee* stands only for the proposition that a state court's final judgment determining *its own* jurisdiction ordinarily qualifies for full faith and credit, so long as the jurisdictional issue was fully and fairly litigated in the court that rendered the judgment.  See *id.*, at 111, 115.  At issue here, however, is not the Texas Probate Court's jurisdiction, but the federal courts' jurisdiction to entertain Vickie's tortious interference claim.  Under our federal system, Texas cannot render its probate courts exclusively competent to entertain a claim of that genre.  Pp. 15–17.

(e) The Ninth Circuit may address on remand the questions whether Vickie's claim was "core" and Pierce's arguments concerning claim and issue preclusion.  P. 17–18.

392 F. 3d 1118, reversed and remanded.

GINSBURG, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, SOUTER, THOMAS, BREYER, and ALITO, JJ., joined. STEVENS, J., filed an opinion concurring in part and concurring in the judgment.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports.  Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

––––––––––

No. 04–1544

––––––––––

## VICKIE LYNN MARSHALL, PETITIONER *v.* E. PIERCE MARSHALL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[May 1, 2006]

JUSTICE GINSBURG delivered the opinion of the Court.

In *Cohens* v. *Virginia*, Chief Justice Marshall famously cautioned: "It is most true that this Court will not take jurisdiction if it should not: but it is equally true, that it must take jurisdiction, if it should . . . .  We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given."  6 Wheat. 264, 404 (1821).  Among longstanding limitations on federal jurisdiction otherwise properly exercised are the so-called "domestic relations" and "probate" exceptions.  Neither is compelled by the text of the Constitution or federal statute.  Both are judicially created doctrines stemming in large measure from misty understandings of English legal history.  See, *e.g.*, Atwood, Domestic Relations Cases in Federal Court: Toward a Principled Exercise of Jurisdiction, 35 Hastings L. J. 571, 584–588 (1984); *Spindel* v. *Spindel*, 283 F. Supp. 797, 802 (EDNY 1968) (collecting cases and commentary revealing vulnerability of historical explanation for domestic relations exception); Winkler, The Probate Jurisdiction of the Federal Courts, 14 Probate L. J. 77, 125–126, and n. 256 (1997) (describing historical

explanation for probate exception as "an exercise in my-thography"). In the years following Marshall's 1821 pro-nouncement, courts have sometimes lost sight of his ad-monition and have rendered decisions expansively interpreting the two exceptions. In *Ankenbrandt* v. *Rich-ards*, 504 U. S. 689 (1992), this Court reined in the "do-mestic relations exception." Earlier, in *Markham* v. *Allen*, 326 U. S. 490 (1946), the Court endeavored similarly to curtail the "probate exception."

Nevertheless, the Ninth Circuit in the instant case read the probate exception broadly to exclude from the federal courts' adjudicatory authority "not only direct challenges to a will or trust, but also questions which would ordinar-ily be decided by a probate court in determining the valid-ity of the decedent's estate planning instrument." 392 F. 3d 1118, 1133 (2004). The Court of Appeals further held that a State's vesting of exclusive jurisdiction over probate matters in a special court strips federal courts of jurisdiction to entertain any "probate related matter," including claims respecting "tax liability, debt, gift, [or] tort." *Id.*, at 1136. We hold that the Ninth Circuit had no warrant from Congress, or from decisions of this Court, for its sweeping extension of the probate exception.

## I

Petitioner, Vickie Lynn Marshall (Vickie), also known as Anna Nicole Smith, is the surviving widow of J. Howard Marshall II (J. Howard). Vickie and J. Howard met in October 1991. After a courtship lasting more than two years, they were married on June 27, 1994. J. Howard died on August 4, 1995. Although he lavished gifts and significant sums of money on Vickie during their courtship and marriage, J. Howard did not include anything for Vickie in his will. According to Vickie, J. Howard intended to provide for her financial security through a gift in the form of a "catch-all" trust.

Respondent, E. Pierce Marshall (Pierce), one of J. Howard's sons, was the ultimate beneficiary of J. Howard's estate plan, which consisted of a living trust and a "pourover" will. Under the terms of the will, all of J. Howard's assets not already included in the trust were to be transferred to the trust upon his death.

Competing claims regarding J. Howard's fortune ignited proceedings in both state and federal courts. In January 1996, while J. Howard's estate was subject to ongoing proceedings in Probate Court in Harris County, Texas, Vickie filed for bankruptcy under Chapter 11 of the Bankruptcy Code, 11 U. S. C. §1101 *et seq.*, in the United States Bankruptcy Court for the Central District of California. See 275 B. R. 5, 8 (CD Cal. 2002). In June 1996, Pierce filed a proof of claim in the federal bankruptcy proceeding, *id.*, at 9; see 11 U. S. C. §501, alleging that Vickie had defamed him when, shortly after J. Howard's death, lawyers representing Vickie told members of the press that Pierce had engaged in forgery, fraud, and overreaching to gain control of his father's assets. 275 B. R., at 9. Pierce sought a declaration that the debt he asserted in that claim was not dischargeable in bankruptcy. *Ibid.*[1] Vickie answered, asserting truth as a defense. She also filed counterclaims, among them a claim that Pierce had tortiously interfered with a gift she expected. *Ibid.;* see App. 23–25. Vickie alleged that Pierce prevented the transfer of his father's intended gift to her by, among other things: effectively imprisoning J. Howard against his wishes; surrounding him with hired guards for the purpose of preventing personal contact between him and Vickie; making misrepresentations to J. Howard; and transferring property against J. Howard's expressed wishes. *Id.*, at 24.

_____

[1] Among debts not dischargeable in bankruptcy, see 11 U. S. C. §523(a), are those arising from "willful and malicious injury by the debtor," §523(a)(6).

Vickie's tortious interference counterclaim turned her objection to Pierce's claim into an adversary proceeding. *Id.*, at 39; see Fed. Rule Bkrtcy. Proc. 3007. In that proceeding, the Bankruptcy Court granted summary judgment in favor of Vickie on Pierce's claim and, after a trial on the merits, entered judgment for Vickie on her tortious interference counterclaim. See 253 B. R. 550, 558–559 (2000). The Bankruptcy Court also held that both Vickie's objection to Pierce's claim and Vickie's counterclaim qualified as "core proceedings" under 28 U. S. C. §157, which meant that the court had authority to enter a final judgment disposing of those claims. See 257 B. R. 35, 39–40 (2000). The court awarded Vickie compensatory damages of more than $449 million—less whatever she recovered in the ongoing probate action in Texas—as well as $25 million in punitive damages. *Id.*, at 40.

Pierce filed a post-trial motion to dismiss for lack of subject-matter jurisdiction, asserting that Vickie's tortious interference claim could be tried only in the Texas probate proceedings. *Id.*, at 36. The Bankruptcy Court held that "the 'probate exception' argument was waived" because it was not timely raised. *Id.*, at 39. Relying on this Court's decision in *Markham*, the court observed that a federal court has jurisdiction to "adjudicate rights in probate property, so long as its final judgment does not undertake to interfere with the state court's possession of the property." 257 B. R., at 38 (citing *Markham*, 326 U. S., at 494).

Meanwhile, in the Texas Probate Court, Pierce sought a declaration that the living trust and his father's will were valid. 392 F. 3d, at 1124–1125. Vickie, in turn, challenged the validity of the will and filed a tortious interference claim against Pierce, *ibid.*, but voluntarily dismissed both claims once the Bankruptcy Court entered its judgment, *id.*, at 1128. Following a jury trial, the Probate Court declared the living trust and J. Howard's will valid. *Id.*, at 1129.

Back in the federal forum, Pierce sought district-court review of the Bankruptcy Court's judgment. While rejecting the Bankruptcy Court's determination that Pierce had forfeited any argument based on the probate exception, the District Court held that the exception did not reach Vickie's claim. 264 B. R. 609, 619–625 (CD Cal. 2001). The Bankruptcy Court "did not assert jurisdiction generally over the probate proceedings . . . or take control over [the] estate's assets," the District Court observed, *id.*, at 621, "[t]hus, the probate exception would bar federal jurisdiction over Vickie's counterclaim only if such jurisdiction would 'interfere' with the probate proceedings," *ibid.* (quoting *Markham*, 326 U. S., at 494). Federal jurisdiction would not "interfere" with the probate proceedings, the District Court concluded, because: (1) success on Vickie's counterclaim did not necessitate any declaration that J. Howard's will was invalid, 264 B. R., at 621; and (2) under Texas law, probate courts do not have exclusive jurisdiction to entertain claims of the kind asserted in Vickie's counterclaim, *id.*, at 622–625.

The District Court also held that Vickie's claim did not qualify as a "core proceedin[g] arising under title 11, or arising in a case under title 11." 28 U. S. C. §157(b)(1); see 264 B. R., at 625–632. A bankruptcy court may exercise plenary power only over "core proceedings." See §157(b)–(c).[2] In non-core matters, a bankruptcy court may not

---

[2] "Core proceedings include, but are not limited to—

"(A) matters concerning the administration of the estate;

"(B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11;

"(C) counterclaims by the estate against persons filing claims against the estate;

"(D) orders in respect to obtaining credit;

enter final judgment; it has authority to issue only pro-
posed findings of fact and conclusions of law, which are
reviewed *de novo* by the district court. See §157(c)(1).
Accordingly, the District Court treated the Bankruptcy
Court's judgment as "proposed[,] rather than final," and
undertook a "comprehensive, complete, and independent
review of" the Bankruptcy Court's determinations. 264
B. R., at 633.

Adopting and supplementing the Bankruptcy Court's
findings, the District Court determined that Pierce had
tortiously interfered with Vickie's expectancy. Specifi-
cally, the District Court found that J. Howard directed his
lawyers to prepare an *inter vivos* trust for Vickie consist-
ing of half the appreciation of his assets from the date of
their marriage. See 275 B. R., at 25–30, 51–53. It further
found that Pierce conspired to suppress or destroy the
trust instrument and to strip J. Howard of his assets by

_____

"(E) orders to turn over property of the estate;

"(F) proceedings to determine, avoid, or recover preferences;

"(G) motions to terminate, annul, or modify the automatic stay;

"(H) proceedings to determine, avoid, or recover fraudulent convey-
ances;

"(I) determinations as to the dischargeability of particular debts;

"(J) objections to discharges;

"(K) determinations of the validity, extent, or priority of liens;

"(L) confirmations of plans;

"(M) orders approving the use or lease of property, including the use
of cash collateral;

"(N) orders approving the sale of property other than property result-
ing from claims brought by the estate against persons who have not
filed claims against the estate;

"(O) other proceedings affecting the liquidation of the assets of the
estate or the adjustment of the debtor-creditor or the equity security
holder relationship, except personal injury tort or wrongful death
claims; and

"(P) recognition of foreign proceedings and other matters under chap-
ter 15 of title 11." 28 U. S. C. A. §157(b)(2) (1993 ed. and July 2005
Supp.).

backdating, altering, and otherwise falsifying documents, arranging for surveillance of J. Howard and Vickie, and presenting documents to J. Howard under false pretenses. See *id.*, at 36–50, 57–58; see also 253 B. R., at 554–556, 559–560. Based on these findings, the District Court awarded Vickie some $44.3 million in compensatory damages. 275 B. R., at 53–57. In addition, finding "overwhelming" evidence of Pierce's "willfulness, maliciousness, and fraud," the District Court awarded an equal amount in punitive damages. *Id.*, at 57–58.

The Court of Appeals for the Ninth Circuit reversed. The appeals court recognized that Vickie's claim "does not involve the administration of an estate, the probate of a will, or any other purely probate matter." 392 F. 3d, at 1133. Nevertheless, the court held that the probate exception bars federal jurisdiction in this case. In the Ninth Circuit's view, a claim falls within the probate exception if it raises "questions which would ordinarily be decided by a probate court in determining the validity of the decedent's estate planning instrument," whether those questions involve "fraud, undue influence[, or] tortious interference with the testator's intent." *Ibid.*

The Ninth Circuit was also of the view that state-court delineation of a probate court's exclusive adjudicatory authority could control federal subject-matter jurisdiction. In this regard, the Court of Appeals stated: "Where a state has relegated jurisdiction over probate matters to a special court and [the] state's trial courts of general jurisdiction do not have jurisdiction to hear probate matters, then federal courts also lack jurisdiction over probate matters." *Id.*, at 1136. Noting that "[t]he [P]robate [C]ourt ruled it had exclusive jurisdiction over all of Vickie['s] claims," the Ninth Circuit held that "ruling . . . binding on the United States [D]istrict [C]ourt." *Ibid.* (citing *Durfee* v. *Duke*, 375 U. S. 106, 115–116 (1963)).

We granted certiorari, 545 U. S. ___ (2005), to resolve the apparent confusion among federal courts concerning the scope of the probate exception. Satisfied that the instant case does not fall within the ambit of the narrow exception recognized by our decisions, we reverse the Ninth Circuit's judgment.

II

In *Ankenbrandt* v. *Richards*, 504 U. S. 689 (1992), we addressed both the derivation and the limits of the "domestic relations exception" to the exercise of federal jurisdiction. Carol Ankenbrandt, a citizen of Missouri, brought suit in Federal District Court on behalf of her daughters, naming as defendants their father (Ankenbrandt's former husband) and his female companion, both citizens of Louisiana. *Id.*, at 691. Ankenbrandt's complaint sought damages for the defendants' alleged sexual and physical abuse of the children. *Ibid.* Federal jurisdiction was predicated on diversity of citizenship. *Ibid.* (citing 28 U. S. C. §1332). The District Court dismissed the case for lack of subject-matter jurisdiction, holding that Ankenbrandt's suit fell within "the 'domestic relations' exception to diversity jurisdiction." 504 U. S., at 692. The Court of Appeals agreed and affirmed. *Ibid.* We reversed the Court of Appeals' judgment. *Id.*, at 706–707.

Holding that the District Court improperly refrained from exercising jurisdiction over Ankenbrandt's tort claim, *id.*, at 704, we traced explanation of the current domestic relations exception to *Barber* v. *Barber*, 21 How. 582 (1859). See *Ankenbrandt*, 504 U. S., at 693–695. In *Barber*, the Court upheld federal-court authority, in a diversity case, to enforce an alimony award decreed by a state court. In dicta, however, the *Barber* Court announced—without citation or discussion—that federal courts lack jurisdiction over suits for divorce or the allowance of ali-

mony. 21 How., at 584–589; see *Ankenbrandt*, 504 U. S., at 693–695.

Finding no Article III impediment to federal-court jurisdiction in domestic relations cases, *id.*, at 695–697, the Court in *Ankenbrandt* anchored the exception in Congress' original provision for diversity jurisdiction, *id.*, at 698–701. Beginning at the beginning, the Court recalled:

> "The Judiciary Act of 1789 provided that 'the circuit courts shall have original cognizance, concurrent with the courts of the several States, of *all suits of a civil nature at common law or in equity, where the matter in dispute exceeds*, exclusive of costs, the sum or value of *five hundred dollars*, and . . . an alien is a party, or the suit is *between a citizen of the State where the suit is brought, and a citizen of another State.*'" *Id.*, at 698 (quoting Act of Sept. 24, 1789, §11, 1 Stat. 78; emphasis added in *Ankenbrandt*).

The defining phrase, "all suits of a civil nature at common law or in equity," the Court stressed, remained in successive statutory provisions for diversity jurisdiction until 1948, when Congress adopted the more economical phrase, "all civil actions." 504 U. S., at 698; 1948 Judicial Code and Judiciary Act, 62 Stat. 930, 28 U. S. C. §1332.

The *Barber* majority, we acknowledged in *Ankenbrandt*, did not expressly tie its announcement of a domestic relations exception to the text of the diversity statute. 504 U. S., at 698. But the dissenters in that case made the connection. They stated that English courts of chancery lacked authority to issue divorce and alimony decrees. Because "the jurisdiction of the courts of the United States in chancery is bounded by that of the chancery in England," *Barber*, 21 How., at 605 (opinion of Daniel, J.), the dissenters reasoned, our federal courts similarly lack authority to decree divorces or award alimony, *ibid.* Such relief, in other words, would not fall within the diversity

statute's original grant of jurisdiction over "all suits of a civil nature at common law or in equity." We concluded in *Ankenbrandt* that "it may be inferred fairly that the jurisdictional limitation recognized by the *[Barber]* Court rested on th[e] statutory basis" indicated by the dissenters in that case. 504 U. S., at 699.

We were "content" in *Ankenbrandt* "to rest our conclusion that a domestic relations exception exists as a matter of statutory construction not on the accuracy of the historical justifications on which [the exception] was seemingly based." *Id.*, at 700. "[R]ather," we relied on "Congress' apparent acceptance of this construction of the diversity jurisdiction provisions in the years prior to 1948, when the statute limited jurisdiction to 'suits of a civil nature at common law or in equity.'" *Ibid.* (quoting 1 Stat. 78). We further determined that Congress did not intend to terminate the exception in 1948 when it "replace[d] the law/equity distinction with the phrase 'all civil actions.'" 504 U. S., at 700. Absent contrary indications, we presumed that Congress meant to leave undisturbed "the Court's nearly century-long interpretation" of the diversity statute "to contain an exception for certain domestic relations matters." *Ibid.*

We nevertheless emphasized in *Ankenbrandt* that the exception covers only "a narrow range of domestic relations issues." *Id.*, at 701. The *Barber* Court itself, we reminded, "sanctioned the exercise of federal jurisdiction over the enforcement of an alimony decree that had been properly obtained in a state court of competent jurisdiction." 504 U. S., at 702. Noting that some lower federal courts had applied the domestic relations exception "well beyond the circumscribed situations posed by *Barber* and its progeny," *id.*, at 701, we clarified that only "divorce, alimony, and child custody decrees" remain outside federal jurisdictional bounds, *id.*, at 703, 704. While recognizing the "special proficiency developed by state tribunals . . . in

handling issues that arise in the granting of [divorce, alimony, and child custody] decrees," *id.*, at 704, we viewed federal courts as equally equipped to deal with complaints alleging the commission of torts, *ibid.*

## III

Federal jurisdiction in this case is premised on 28 U. S. C. §1334, the statute vesting in federal district courts jurisdiction in bankruptcy cases and related proceedings. Decisions of this Court have recognized a "probate exception," kin to the domestic relations exception, to otherwise proper federal jurisdiction. See *Markham* v. *Allen*, 326 U. S., at 494; see also *Sutton* v. *English*, 246 U. S. 199 (1918); *Waterman* v. *Canal-Louisiana Bank & Trust Co.,* 215 U. S. 33 (1909). Like the domestic relations exception, the probate exception has been linked to language contained in the Judiciary Act of 1789.

*Markham*, the Court's most recent and pathmarking pronouncement on the probate exception, stated that "the equity jurisdiction conferred by the Judiciary Act of 1789 . . . , which is that of the English Court of Chancery in 1789, did not extend to probate matters." 326 U. S., at 494. See generally Nicolas, Fighting the Probate Mafia: A Dissection of the Probate Exception to Federal Jurisdiction, 74 S. Cal. L. Rev. 1479 (2001). As in *Ankenbrandt*, so in this case, "[w]e have no occasion . . . to join the historical debate" over the scope of English chancery jurisdiction in 1789, 504 U. S., at 699, for Vickie Marshall's claim falls far outside the bounds of the probate exception described in *Markham*. We therefore need not consider in this case whether there exists any uncodified probate exception to federal bankruptcy jurisdiction under §1334.[3]

—————

  [3] We note that the broad grant of jurisdiction conferred by §1334(b) is subject to a mandatory abstention provision applicable to certain state-law claims. Section 1334(c)(2) provides:

In *Markham*, the plaintiff Alien Property Custodian[4] commenced suit in Federal District Court against an executor and resident heirs to determine the Custodian's asserted rights regarding a decedent's estate. 326 U. S., at 491–492. Jurisdiction was predicated on §24(1) of the Judicial Code, now 28 U. S. C. §1345, which provides for federal jurisdiction over suits brought by an officer of the United States. At the time the federal suit commenced, the estate was undergoing probate administration in a state court. The Custodian had issued an order vesting in himself all right, title, and interest of German legatees. He sought and gained in the District Court a judgment

——————

"Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction."

That provision is, in turn, qualified: "Non-core proceedings under section 157(b)(2)(B) of title 28, United States Code, shall not be subject to the mandatory abstention provisions of section 1334(c)(2)." §157(b)(4). Because the Bankruptcy Court rejected Pierce's motion for mandatory abstention as untimely, 257 B. R. 35, 39 (CD Cal. 2000), we need not consider whether these provisions might have required abstention upon a timely motion.

⁴Section 6 of the Trading with the Enemy Act, 40 Stat. 415, 50 U. S. C. App., authorizes the President to appoint an official known as the "alien property custodian," who is responsible for "receiv[ing,] . . . hold[ing], administer[ing], and account[ing] for" "all money and property in the United States due or belonging to an enemy, or ally of enemy . . . ." The Act was originally enacted during World War I "to permit, under careful safeguards and restrictions, certain kinds of business to be carried on" among warring nations, and to "provid[e] for the care and administration of the property and property rights of enemies and their allies in this country pending the war." *Markham* v. *Cabell*, 326 U. S. 404, 414, n. 1 (1945) (Burton, J., concurring) (quoting S. Rep. No. 113, 65th Cong., 1st Sess., p. 1 (1917)).

determining that the resident heirs had no interest in the estate, and that the Custodian, substituting himself for the German legatees, was entitled to the entire net estate, including specified real estate passing under the will.

Reversing the Ninth Circuit, which had ordered the case dismissed for want of federal subject-matter jurisdiction, this Court held that federal jurisdiction was properly invoked. The Court first stated:

> "It is true that a federal court has no jurisdiction to probate a will or administer an estate . . . . But it has been established by a long series of decisions of this Court that federal courts of equity have jurisdiction to entertain suits 'in favor of creditors, legatees and heirs' and other claimants against a decedent's estate 'to establish their claims' so long as the federal court does not interfere with the probate proceedings or assume general jurisdiction of the probate or control of the property in the custody of the state court." 326 U. S., at 494 (quoting *Waterman*, 215 U. S., at 43).

Next, the Court described a probate exception of distinctly limited scope:

> "[W]hile a federal court may not exercise its jurisdiction to disturb or affect the possession of property in the custody of a state court, . . . it may exercise its jurisdiction to adjudicate rights in such property where the final judgment does not undertake to interfere with the state court's possession save to the extent that the state court is bound by the judgment to recognize the right adjudicated by the federal court." 326 U. S., at 494.

The first of the above-quoted passages from *Markham* is not a model of clear statement. The Court observed that federal courts have jurisdiction to entertain suits to determine the rights of creditors, legatees, heirs, and other

claimants against a decedent's estate, "so long as the federal court does not *interfere with the probate proceedings.*" *Ibid.* (emphasis added). Lower federal courts have puzzled over the meaning of the words "interfere with the probate proceedings," and some have read those words to block federal jurisdiction over a range of matters well beyond probate of a will or administration of a decedent's estate. See, *e.g.*, *Mangieri* v. *Mangieri*, 226 F. 3d 1, 2–3 (CA1 2000) (breach of fiduciary duty by executor); *Golden ex rel. Golden* v. *Golden*, 382 F. 3d 348, 360–362 (CA3 2004) (same); *Lepard* v. *NBD Bank*, 384 F. 3d 232–237 (CA6 2004) (breach of fiduciary duty by trustee); *Storm* v. *Storm*, 328 F. 3d 941, 943–945 (CA7 2003) (probate exception bars claim that plaintiff's father tortiously interfered with plaintiff's inheritance by persuading trust grantor to amend irrevocable *inter vivos* trust); *Rienhardt* v. *Kelly*, 164 F. 3d 1296, 1300–1301 (CA10 1999) (probate exception bars claim that defendants exerted undue influence on testator and thereby tortiously interfered with plaintiff's expected inheritance).

We read *Markham*'s enigmatic words, in sync with the second above-quoted passage, to proscribe "disturb[ing] or affect[ing] the possession of property in the custody of a state court." 326 U. S., at 494. True, that reading renders the first-quoted passage in part redundant, but redundancy in this context, we do not doubt, is preferable to incoherence. In short, we comprehend the "interference" language in *Markham* as essentially a reiteration of the general principle that, when one court is exercising *in rem* jurisdiction over a *res*, a second court will not assume *in rem* jurisdiction over the same *res.* See, *e.g.*, *Penn General Casualty Co.* v. *Pennsylvania ex rel. Schnader*, 294 U. S. 189, 195–196 (1935); *Waterman*, 215 U. S., at 45–46. Thus, the probate exception reserves to state probate courts the probate or annulment of a will and the administration of a decedent's estate; it also precludes federal

courts from endeavoring to dispose of property that is in the custody of a state probate court. But it does not bar federal courts from adjudicating matters outside those confines and otherwise within federal jurisdiction.

## A

As the Court of Appeals correctly observed, Vickie's claim does not "involve the administration of an estate, the probate of a will, or any other purely probate matter." 392 F. 3d, at 1133. Provoked by Pierce's claim in the bankruptcy proceedings, Vickie's claim, like Carol Ankenbrandt's, alleges a widely recognized tort. See *King* v. *Acker*, 725 S. W. 2d 750, 754 (Tex. App. 1987); Restatement (Second) of Torts §774B (1977) ("One who by fraud, duress or other tortious means intentionally prevents another from receiving from a third person an inheritance or gift that [s]he would otherwise have received is subject to liability to the other for loss of the inheritance or gift."). Vickie seeks an *in personam* judgment against Pierce, not the probate or annulment of a will. Cf. *Sutton*, 246 U. S., at 208 (suit to annul a will found "supplemental to the proceedings for probate of the will" and therefore not cognizable in federal court). Nor does she seek to reach a *res* in the custody of a state court. See *Markham*, 326 U. S., at 494.

Furthermore, no "sound policy considerations" militate in favor of extending the probate exception to cover the case at hand. Cf. *Ankenbrandt*, 504 U. S., at 703. Trial courts, both federal and state, often address conduct of the kind Vickie alleges. State probate courts possess no "special proficiency . . . in handling [such] issues." Cf. *id.*, at 704.

## B

The Court of Appeals advanced an alternate basis for its conclusion that the federal courts lack jurisdiction over

Vickie's claim. Noting that the Texas Probate Court
"ruled it had exclusive jurisdiction over all of Vickie Lynn
Marshall's claims against E. Pierce Marshall," the Ninth
Circuit held that "ruling . . . binding on the United States
[D]istrict [C]ourt." 392 F. 3d, at 1136. We reject that
determination.

Texas courts have recognized a state-law tort action for
interference with an expected inheritance or gift, modeled
on the Restatement formulation. See *King*, 725 S. W. 2d,
at 754; *Brandes* v. *Rice Trust, Inc.*, 966 S. W. 2d 144, 146–
147 (Tex. App. 1998).[5]  It is clear, under *Erie R. Co.* v.

_____

[5] Texas appellate courts have on occasion held claims of tortious in-
terference with an expected inheritance "barred" by a prior probate
court judgment, apparently applying ordinary principles of preclusion.
See, *e.g.*, *Thompson* v. *Deloitte & Touche*, 902 S. W. 2d 13, 16 (Tex. App.
1995) (final probate court judgment bars claim of tortious interference
with inheritance expectancy because probate court "necessarily found
that [the decedent] signed the will with testamentary capacity, and
that it reflected his intent, was not the result of coercion or undue
influence, and was valid"); *Neill* v. *Yett*, 746 S. W. 2d 32, 35–36 (Tex.
App. 1988) (complaint alleging fraud and tortious interference with
inheritance expectancy, filed more than two years after will was admit-
ted to probate, was barred by both the statute of limitations and the
final probate judgment, and failed to state the elements of the claim).
Neither *Thompson* nor *Neill* questions the Texas trial courts' subject-
matter jurisdiction over the claims in question.

Pierce maintains that *Thompson*, *Neill*, and other Texas decisions
support his contention that preclusion principles bar Vickie's claim.
See Brief for Respondent 36–38. Vickie argues to the contrary. See
Brief for Petitioner 42 n. 30 (urging that preclusion does not apply
because (1) Vickie's claim was not litigated to final judgment in the
Texas probate proceedings; (2) having presented her claim in the
Bankruptcy Court years before she joined the Texas will contest, Vickie
was not obliged to present her claim in the Texas proceedings; (3) the
Bankruptcy Court's judgment preceded the Probate Court judgment;
and (4) the Texas Probate Court did not have before it important
evidence). See also Tex. Rule Civ. Proc. 97; *Ingersoll-Rand Co.* v.
*Valero Energy Corp.*, 997 S. W. 2d 203, 206–207 (Tex. 1999). The
matter of preclusion remains open for consideration on remand. See
*infra*, at 18.

*Tompkins*, 304 U. S. 64 (1938)*,* that Texas law governs the substantive elements of Vickie's tortious interference claim. It is also clear, however, that Texas may not reserve to its probate courts the exclusive right to adjudicate a transitory tort. We have long recognized that "a State cannot create a transitory cause of action and at the same time destroy the right to sue on that transitory cause of action in any court having jurisdiction." *Tennessee Coal, Iron & R. Co.* v. *George*, 233 U. S. 354, 360 (1914). Jurisdiction is determined "by the law of the court's creation and cannot be defeated by the extraterritorial operation of a [state] statute . . . , even though it created the right of action." *Ibid.* Directly on point, we have held that the jurisdiction of the federal courts, "having existed from the beginning of the Federal government, [can] not be impaired by subsequent state legislation creating courts of probate." *McClellan* v. *Carland*, 217 U. S. 268, 281 (1910) (upholding federal jurisdiction over action by heirs of decedent, who died intestate, to determine their rights in the estate (citing *Waterman*, 215 U. S. 33)).

Our decision in *Durfee* v. *Duke*, 375 U. S. 106 (1963), relied upon by the Ninth Circuit, 392 F. 3d, at 1136, is not to the contrary. *Durfee* stands only for the proposition that a state court's final judgment determining *its own* jurisdiction ordinarily qualifies for full faith and credit, so long as the jurisdictional issue was fully and fairly litigated in the court that rendered the judgment. See 375 U. S., at 111, 115. At issue here, however, is not the Texas Probate Court's jurisdiction, but the federal courts' jurisdiction to entertain Vickie's tortious interference claim. Under our federal system, Texas cannot render its probate courts exclusively competent to entertain a claim of that genre. We therefore hold that the District Court properly

asserted jurisdiction over Vickie's counterclaim against
Pierce.

## IV

After determining that Vickie's claim was not a "core
proceeding," the District Court reviewed the case *de novo*
and entered its final judgment on March 7, 2002. 275
B. R., at 5–8. The Texas Probate Court's judgment be-
came final on February 11, 2002, nearly one month ear-
lier. App. to Pet. for Cert. 41. The Court of Appeals con-
sidered only the issue of federal subject-matter
jurisdiction. It did not address the question whether
Vickie's claim was "core"; nor did it address Pierce's argu-
ments concerning claim and issue preclusion. 392 F. 3d,
at 1137. These issues remain open for consideration on
remand.

\*    \*    \*

For the reasons stated, the judgment of the Court of
Appeals for the Ninth Circuit is reversed, and the case is
remanded for further proceedings consistent with this
opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 04–1544

———————

## VICKIE LYNN MARSHALL, PETITIONER *v.* E. PIERCE MARSHALL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[May 1, 2006]

JUSTICE STEVENS, concurring in part and concurring in the judgment.

The administration of decedents' estates typically is governed by rules of state law and conducted by state probate courts. Occasionally, however, disputes between interested parties arise, either in the probate proceeding itself or elsewhere, that qualify as cases or controversies that federal courts have jurisdiction to decide. See, *e.g.*, *Reed* v. *Reed,* 404 U. S. 71 (1971). In her opinion for the Court, JUSTICE GINSBURG has cogently explained why this is such a case. I write separately to explain why I do not believe there is any "probate exception" that ousts a federal court of jurisdiction it otherwise possesses.

The familiar aphorism that hard cases make bad law should extend to easy cases as well. *Markham* v. *Allen,* 326 U. S. 490 (1946), like this case, was an easy case. In *Markham*, as here, it was unnecessary to question the historical or logical underpinnings of the probate exception to federal jurisdiction because, whatever the scope of the supposed exception, it did not extend to the case at hand. But *Markham*'s obiter dicta—dicta that the Court now describes as redundant if not incoherent, *ante*, at 14—generated both confusion and abdication of the obligation Chief Justice Marshall so famously articulated, see *Cohens* v. *Virginia,* 6 Wheat. 264, 404 (1821); see also

*ante*, at 1.  While the Court today rightly abandons much of that dicta*,* I would go further.

The Court is content to adopt the approach it followed in *Ankenbrandt* v. *Richards,* 504 U. S. 689 (1992), and to accept as foundation for the probate exception *Markham*'s bald assertion that the English High Court of Chancery's jurisdiction did not "extend to probate matters" in 1789. 326 U. S., at 495; see *ante*, at 11.  I would not accept that premise.  Not only had the theory *Markham* espoused been only sporadically and tentatively cited as justification for the exception,[1] but the most comprehensive article on the subject has persuasively demonstrated that *Markham*'s assertion is "an exercise in mythography."[2]

*Markham*'s theory apparently is the source of the Court's reformulated exception, which "reserves to state probate courts the probate or annulment of a will and the administration of a decedent's estate." *Ante*, at 14.  Although undoubtedly narrower in scope than *Markham*'s ill-considered description of the probate carve-out, this description also sweeps too broadly.  For the Court has correctly upheld the exercise of federal jurisdiction over actions involving the annulment of wills and the admini-

_____

[1] Notably, Justice Joseph Bradley, a strong proponent of the theory that federal courts sitting in equity cannot exercise jurisdiction over probate matters because in England in 1789 such jurisdiction belonged to the ecclesiastical courts, see *Case of Broderick's Will,* 21 Wall. 503 (1875), *Gaines* v. *Fuentes,* 92 U. S. 10, 24-25 (1876) (dissenting opinion), urged that "even in matters savoring of [e]cclesiastical process, after an issue has been formed between definite parties," the controversy should be heard by a federal court.  See *Rosenbaum* v. *Bauer,* 120 U. S. 450, 460-461 (1887) (dissenting opinion) (citing *Gaines*, 92 U. S., at 17, and *Hess* v. *Reynolds,* 113 U. S. 73 (1885)).

[2] Winkler, The Probate Jurisdiction of the Federal Courts, 14 Probate L. J. 77, 126 (1997); see *ante*, at 1–2 (acknowledging Winkler's analysis).  Winkler also observes, citing Charles Dickens' Bleak House (1853), that *Markham*'s "suggestion that the High Court of Chancery had lacked jurisdiction to 'administer an estate' was preposterous."  14 Probate L. J., at 125, and n. 256.

stration of decedents' estates.  In *Gaines* v. *Fuentes,* 92 U. S. 10 (1876), for example, the Court held that a defendant in an action to annul a will should be permitted to remove the case to federal court.  In so doing, it explained:

> "[W]henever a controversy in a suit . . . arises respecting the validity or construction of a will, or the enforcement of a decree admitting it to probate, there is no more reason why the Federal courts should not take jurisdiction of the case than there is that they should not take jurisdiction of any other controversy between the parties." *Id.*, at 22.

Likewise, in *Payne* v. *Hook,* 7 Wall. 425 (1869), the Court explained that it was "well settled that a court of chancery, as an incident to its power to enforce trusts, and make those holding a fiduciary relation account, has jurisdiction to compel executors and administrators to account and distribute the assets in their hands." *Id.*, at 431.  (In that same case, a federal court later appointed a Special Master to administer the estate.  This Court upheld some of the Master's determinations and rejected others.  See *Hook* v. *Payne,* 14 Wall. 252, 255 (1872).)

To be sure, there are cases that support limitations on federal courts' jurisdiction over the probate and annulment of wills and the administration of decedents' estates. But careful examination reveals that at least most of the limitations so recognized stem not from some *sui generis* exception, but rather from generally applicable jurisdictional rules.  Cf. *Ellis* v. *Davis,* 109 U. S. 485, 497 (1883) ("Jurisdiction as to wills, and their probate as such, is neither included in nor excepted out of the grant of judicial power to the courts of the United States").  Some of those rules, like the rule that diversity jurisdiction will not attach absent an *inter partes* controversy, plainly are still relevant today.  See, *e.g.*, *Waterman* v. *Canal-Louisiana Bank & Trust Co.,* 215 U. S. 33, 44–45 (1909); see also *id.*,

at 46 (reaffirming the *in gremio legis* principle). Others, like the rule that a bill in equity will lie only where there is no adequate remedy elsewhere, have less straightforward application in the wake of 20th-century jurisdictional developments. See, *e.g.*, *Case of Broderick's Will,* 21 Wall. 503, 510–512 (1875); *Ellis*, 109 U. S., at 503 (denying relief where plaintiff had "a plain, adequate, and complete remedy at law"); see also Winkler, *supra*, n.2, at 112–113. Whatever the continuing viability of these individual rules, together they are more than adequate to the task of cabining federal courts' jurisdiction. They require no helping hand from the so-called probate exception.

Rather than preserving whatever vitality that the "exception" has retained as a result of the *Markham* dicta, I would provide the creature with a decent burial in a grave adjacent to the resting place of the *Rooker-Feldman* doctrine. See *Lance* v. *Dennis*, 546 U. S. ___, ___ (2006) (STEVENS, J., dissenting) (slip op., at 2–3).